IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF OKLAHOMA

PROGRESSIVE NORTHERN )
INSURANCE COMPANY, )
 )
        Plaintiff, )
 )
v. )
 )  Case No.: 09-cv-478-HE
JAMES  L. BATESEL, TRINITY BRICK )
SALES, INC., TRINITY BRICK SALES, )
LLC, and STATE AUTO PROPERTY AND)
CASUALTY INSURANCE COMPANY, )
 )
        Defendants. )

---

## PLAINTIFF'S RESPONSE IN OPPOSITION
## TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Respectfully submitted,


Brad L. Roberson, OBA No. 18819
Dawn M. Goeres, OBA No. 21923
PIGNATO, COOPER, KOLKER & ROBERSON, P.C.
1120 Robinson Renaissance
119 North Robinson Avenue
Oklahoma City, Oklahoma 73102
Telephone:   (405) 606-3333
Facsimile:    (405) 606-3334
**ATTORNEYS FOR PLAINTIFF**


March 09, 2010

## TABLE OF CONTENTS

TABLE OF CONTENTS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

INTRODUCTION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS.. . . . . . . . . . 4

PLAINTIFF'S COUNTER-STATEMENT OF UNDISPUTED MATERIAL FACTS.. . . . . . . . . . . . . . 9

ARGUMENTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

   APPLICABLE STANDARDS:. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      **PROPOSITION I: THE ISSUE OF WHETHER MR. BATESEL WAS A PROXIMATE CAUSE OF THE ACCIDENT <u>MUST</u> BE LEFT FOR A TRIER OF FACT.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

      **PROPOSITION II: THE ISSUE OF WHETHER TRINITY BRICK WAS A DIRECT PROXIMATE CAUSE OF THE ACCIDENT <u>MUST</u> BE LEFT FOR A TRIER OF FACT.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

      **PROPOSITION III: OKLAHOMA LAW EXPRESSLY PERMITS A CONTRIBUTION ACTION AGAINST A TORTFEASOR WHICH IS JOINTLY <u>OR</u> SEVERALLY LIABLE.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Bannister v. Noble*,
812 F.2d 1265 (10th Cir.1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24-25

*Beesley v. United States*,
364 F.2d 194 (10th Cir.1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Blanke v. Alexander*,
152 F.3d 1224, 1235 (10th Cir.1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Dirickson v. Mings*,
910 P.2d 1015 (Okla.1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*England v. Kilcrease*,
 456 P.2d 521 (Okla.1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Evans v. Caldwell*,
429 P.2d 962 (Okla.1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22-23

*Jackson v. Jones*,
907 P.2d 1067, 1072 (Okla.1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 21, 25-26

*Johnson v. Hillcrest Health Center, Inc.*,
70 P.3d 811 (Okla.2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Jones v. Mercy Health Center, Inc.*,
155 P.3d 9 (Okla.2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Mote v. Hilyard*,
358 P.2d 844 (Okla.1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Phillips Petroleum Co. v. Robertson*,
247 P.2d 277 (Okla.1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Ross v. Gearin*,
291 P.534 (Okla.1930). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Sturdevant v. Kent,*
322 P.2d 408 (Okla.1958). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Thur v. Dunkley,*
474 P.2d 403 (Okla.1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Tomlinson v. Love's Country Stores, Inc.,*
854 P.2d 910, 915 – 16 (Okla.1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-20

*Vogt v. Gen. Tel. Co. of Southwest,*
413 F.Supp. 4 (E.D.Okl.1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Woodward v. Kinchen,*
446 P.2d 375 (Okla.1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## STATUTES

12 O.S. § 832. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 30

Plaintiff, Progressive Northern Insurance Company ("Progressive"), submits the following Response in Opposition to Defendants' Motion for Summary Judgment [**Doc. No. 43**].

## INTRODUCTION

Defendants' entire Motion for Summary Judgment is premised on flawed interpretations of Oklahoma law.  Defendants, in support of their "cause versus condition" argument, summarize a series of cases in which there were no disputed facts and/or all reasonable inferences drawn from any undisputed facts resulted in the legal determination that the party at issue was not, often due to the intervention of a supervening cause, a proximate cause of an accident. These cases <u>all</u> rest on the legal determination that the party who claimed to be a condition rather than a cause <u>could not have foreseen</u> the particular injury that followed his or her negligent act.

The accident of November 14, 2005, despite Defendants' characterization, involved <u>three</u> vehicles.  It is true that only two vehicles – Ms. Kinney's car and Mr. Payne's truck – actually collided, but the undisputed facts give rise to the reasonable inference that both Mr. Batesel and Trinity Brick were proximate causes of the accident.  Mr. Batesel was delivering a load of bricks to the subdivision in which Ms. Kinney lived, and he was in a hurry because he gets paid by the load.  He did not know when he left the Trinity Brick yard that he was driving to a gated subdivision, but recognized <u>before</u> he pulled his truck from northbound Coltrane Road ("Coltrane") onto westbound Oakdale Forest Road ("Oakdale") that the

1

entryway was gated and closed.  He also knew, before he made that left-hand turn, that he needed a code to open the gate and did not have that code.  Finally, he understood that by making the left-hand turn onto Oakdale, his truck would be partially blocking southbound Coltrane.  In fact, Mr. Batesel <u>expected</u> that southbound traffic on Coltrane would see his truck and <u>would go around it</u>.

It was only <u>after</u> Mr. Batesel pulled onto Oakdale and partially blocked southbound Coltrane that he began to call a number on his delivery ticket to attempt to get the gate code.  At this time, Ms. Kinney began to exit the subdivision.  She offered to assist Mr. Batesel by using the remote in her car to open the gate.  He eventually accepted her help.  Ms. Kinney specifically informed Mr. Batesel that she was going to turn her car around to open the gate.  Knowing this, and also knowing that he <u>expected</u> vehicles on southbound Coltrane Road <u>to go around his truck</u>, Mr. Batesel clearly could have foreseen the accident that occurred.  Despite this, he simply walked away from Ms. Kinney and climbed back into his truck.

Mr. Batesel did not take the admittedly safer course of driving past the subdivision's gated entry because it would not have been convenient for him and would have required him to go out of his way.  Mr. Batesel discovered <u>after</u> the accident that there was a "better" entrance to the delivery site which would not have required him to block traffic.  Despite the clear evidence that the northbound lane of Coltrane Road had a paved shoulder that extended as far as five feet on the east side of that lane, Mr. Batesel has maintained at different times that there was <u>no</u> shoulder at all or that the shoulder was less than half its actual size.  Mr. Batesel's failure to recognize the existence of this shoulder and to take the more reasonable

step of pulling his truck over on the shoulder of the northbound lane of Coltrane Road is but one of the numerous negligent acts that proximately caused this accident.

Mr. Batesel testified that he gets into positions similar to the one presented by this accident all of the time. He often finds himself having to back out of positions or otherwise block traffic on roads with speed limits of 45 mph. Despite this, Trinity Brick had no system in place to ascertain the most accessible entry to a delivery site, to determine whether a delivery site was blocked or gated, or to confirm that any such obstructions to the entry of a delivery site would be removed. Trinity Brick first answered discovery by stating that it had, at the time of the accident, a clear process in place for identifying these issues. Then, through its corporate representative and principal, Trinity Brick testified that it did <u>not</u> have any such process in place on November 14, 2005, despite the fact that asking the relevant questions would take 20 seconds at most. Instead, Trinity Brick relied on its customers to give it information related to gates or obstructions.

The disputed facts and the reasonable inferences that can be drawn from the undisputed facts in this matter demonstrate that neither Mr. Payne nor Ms. Kinney acted independently of the negligent acts of Mr. Batesel and Trinity Brick. To the contrary, the acts of Mr. Payne and Ms. Kinney were predicated and dependent upon those negligent acts. It is also clear that Mr. Batesel and Trinity Brick could reasonably have foreseen this type of accident arising from their negligent acts. As such, summary judgment in favor of Defendants on the issue of proximate cause is unwarranted.

Defendants' interpretation of Oklahoma's Contribution Act is incorrect.  Defendants ignore Oklahoma cases which have specifically interpreted the Contribution Act.  Without any support and in direct contradiction to precedential case law, Defendants maintain that Plaintiff's acknowledgment that Ms. Kinney may have had some percentage of responsibility for the accident bars Plaintiff from seeking contribution from Defendants.  Defendants have obviously misinterpreted the concepts of joint and several liability and contribution as codified by Oklahoma statutory law.  The decision to settle a case with a claimant does not equitably estop a tortfeasor from seeking contribution from a co-tortfeasor.  In fact, the intent of the Contribution Act is to encourage settlement with injured parties and preserve a tortfeasor's right to seek contribution from other tortfeasors for any amounts the settling party paid in excess of its pro rata share of liability.  For these reasons and for the reasons set forth in Plaintiff's Response to Defendants' Motion to Compel [**DOC. NO. 38**], all of which Plaintiff incorporates by reference, Plaintiff respectfully submits that they have clearly presented a viable cause of action pursuant to the Oklahoma Contribution Act.

### RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      Admitted that Ms. Kinney was involved in an accident on November 14, 2005. Disputed to the extent this paragraph suggests that Mr. Batesel was not involved in and a proximate cause of that accident as more fully set forth in Plaintiff's Counter-Statement of Undisputed Material Facts ("Plaintiff's Counter-Statement").

2.      Disputed to the extent the paragraph suggests Mr. Batesel's "parked truck" was totally within the "entryway drive to the housing edition which Ms. Kinney was exiting."

4

Mr. Batesel's truck, with the attached forklift, extended well into the southbound lane of travel on Coltrane Road, as more fully set forth in Plaintiff's Counter-Statement.

3.     Admitted that Ms. Kinney was involved in an accident on November 14, 2005. Disputed to the extent that this paragraph suggests that Mr. Batesel was not involved in and a proximate cause of that accident as more fully set forth in Plaintiff's Counter-Statement.

4.     Admitted.

5.     Disputed as stated and to the extent that this paragraph suggests Mr. Payne was required to stop and wait, indefinitely, for Mr. Batesel to clear the roadway.  As set forth in ¶ 20 of Plaintiff's Counter-Statement, Mr. Batesel "expected people to go around" his truck. Specifically, Mr. Payne testified as follows:

> Q.     In any case, as a professional driver who's got a C.D.L., what do solid yellow lines mean to you?
>
> A.     Do not pass.

*See* Excerpts of Transcript of David Ralph Payne, attached as **EXHIBIT 1** at p. 19, ll. 4-7.

6.     Disputed as stated.  Mr. Payne has specifically testified that he first saw Mr. Batesel's truck, not "in the entryway to the Oakdale housing edition," but "blocking [his] lane" of southbound Coltrane.  More specifically, Mr. Payne testified, "When [he] came over the bridge, [he] seen [sic] the truck blocking [his] lane" and that he was "50 yards, 60 yards" away from the brick truck when he first saw it.  Mr. Payne also testified that the rear of Mr. Batesel's trailer and attached forklift was "[m]aybe a foot, a foot and a half, two foot from the yellow line," and "almost completely blocking [his] lane of travel." *Id.* at p. 21, l. 21 – p. 22, l. 5; p. 23, ll. 2-4, and p. 91, ll. 8-18.  This fact is further disputed to the extent that the

photographs attached as Exhibit 8 in support of this paragraph were taken from the south side of the accident site, facing north, which is the opposite direction Mr. Payne was traveling. As such, these photographs do not accurately reflect the view Mr. Payne had as he crested the hill and crossed the bridge while traveling south from the <u>north</u> side of the accident. Plaintiff maintains that these photographs are not accurate representations of the accident sites as Mr. Batesel has testified that the positioning of the truck is not quite correct and in light of the fact that the bricks which were on the Trinity Brick truck at the time of the accident are not on the trailer in the photographs.  Defendants' Exhibit 8 demonstrates the distance between the crest of the hill and the bridge which are located on the north side of the accident site, where Mr. Payne first had opportunity to observe Mr. Batesel's vehicle. The photograph attached hereto as **EXHIBIT 2** is a photograph which was taken from the north side of the accident site, but which does not include Mr. Batesel's truck and trailer. The photograph attached hereto as **EXHIBIT 3** is also taken from the north side of the accident site, directly at the location of the accident.

7.      Disputed to the extent that this paragraph suggests Mr. Payne did not slow down prior to the accident at issue.  Mr. Payne testified that at the time of the wreck he had slowed down from 45 mph, the posted speed limit, to 40 mph.  He had let off the throttle of his vehicle and started slowing down when he came over the bridge and saw Mr. Batesel's truck blocking his lane.  **EXHIBIT 1** at p. 51, l. 22 – p.  52, l. 9.

8.      Disputed as stated in that this paragraph fails to inform the court that the <u>reason</u> Ms. Kinney could not see whether any traffic was coming from the north on Coltrane was

because her view was completely blocked by Mr. Batesel's brick truck. *See* Excerpts of Transcript of Deposition of Carroll Kinney attached as **EXHIBIT 4** at p. 98, l. 25 – p. 100, l. 8, p. 101, ll. 4-13, and p. 108, l. 16 – p. 109 l. 6.

9.    Admitted to the extent that this is Mr. Payne's testimony. **EXHIBIT 1** at p. 91, ll. 3-7. Disputed to the extent that Ms. Kinney has testified that she was able to peek around the end of the Trinity Brick truck after inching out onto Coltrane and, upon looking north to see whether there was any southbound traffic, she testified that she saw none. **EXHIBIT 4** at p. 98, l. 24 – p. 99, l.10, p. 100, ll. 2-6, p. 101, ll. 18-24, p. 103, ll. 13-17, p. 112, l. 4 – p. 21.

10.    Irrelevant and disputed as stated. Mr. Ferris was uncertain what his title was at the time of the November 14, 2005, accident. Admitted that Mr. Ferris is currently an employee of Plaintiffs. *See* Excerpts of Transcripts of Deposition of Chris Ferris, attached as **EXHIBIT 5**, p. 8, l. 16 – p. 10, l. 16.

11.    Irrelevant. As more fully set forth in Plaintiff's Counter-Statement, ¶ 34, Mr. Ferris was called as a fact witness, not as a corporate representative or designee of Plaintiff. Further, Mr. Ferris has no legal training. *Id.* at p. 10, l. 17 – p. 13, l. 12. The extent of Mr. Ferris' training on the concept of liability is two two-week educational courses provided by Progressive and his ongoing, on-the-job training. *Id.* Further, counsel for Progressive objected to the lines of questioning involving liability determinations, as they called for legal conclusions. *Id.* at p. 40, l. 13 – p. 42, l. 15. Also disputed as stated, in that Mr. Ferris never "made a decision on behalf of Plaintiff regarding the liability of all parties involved." *Id.* at p. 26, l. 22 – p. 27, ll. 1-4, p. 31, l. 14 – p. 33, l. 13.

12.     Irrelevant for all of the reasons set forth in ¶ 11, above.  Also disputed to the extent that Defendants suggest that Mr. Ferris' initial determination and the correspondence he authored in that respect were made with a "understanding of the meaning of 'contributory negligence'," or that he "made a liability determination which employed the legal concept of 'contributory negligence.'"   Mr. Ferris testified that his meaning of "contributory negligence" was that "[t]here is negligence on the part of multiple parties." **EXHIBIT 5** at p. 32, ll. 10-15.  Further, Mr. Ferris testified that he determined all three of the parties involved in the accident at issue has "some degree of negligence." *Id.* at p. 32, ll. 16-22.  Mr. Ferris also testified that his initial determination could have been revised based on new information. *Id.* at p. 32, l. 23 – p. 33, l. 13.  Mr. Ferris also specifically stated that he "wouldn't take a position" on "whether Progressive is entitled to seek contribution under [Oklahoma] statutes when Plaintiff bears some share of the negligence." *Id.* at p. 42, ll. 7-15.

13.     Irrelevant for all of the reasons set forth in ¶ 11, above.  Also disputed to the extent that Defendants rely on this "fact" in support of a legal conclusion or argument that Progressive is barred from seeking contribution.  Additionally, Mr. Ferris testified that his initial determination was subject to revision if additional information gathered in the course of the investigation of the claim warranted such revision. *Id.* at p. 32, l. 23 – p. 33, l. 13.

14.     Irrelevant for all of the reasons set forth in ¶ 11, above.  Also disputed to the extent that Defendants rely upon this "fact" in support of any legal argument that Progressive is barred from seeking contributions.  Admitted to the extent that Chris Ferris, approximately two months after the accident, on January 17, 2006, sent correspondence directly to

Defendant, Trinity Brick, in which he assigned 15% negligence to James Batesel for improper parking and creating an obstruction of vision, 5% negligence to Mrs. Kinney for failure to devote her attention to the roadway and 80% liability to Mr. Payne for driving left of center and making an improper lane change. **EXHIBIT 6**, correspondence dated January 17, 2006, from Chris Ferris to the Claims Department of Trinity Brick.

15.    Disputed to the extent Defendants suggest that 12 O.S. §832 permits contribution only among <u>joint</u> tortfeasors.  The statute also permits contribution from other tortfeasors who are found <u>severally</u> liable.  Specifically, 12 O.S. §832 states in relevant portion as follows:

>     A.    When two or more persons become jointly **or** severally liable in tort for the same injury to person or property or for the same wrongful death, there is a right of contribution among them even though judgment has not been recovered against all or any of them except as provided in this section.

12 O.S. §832 (emphasis added).

### **PLAINTIFF'S COUNTER-STATEMENT OF UNDISPUTED MATERIAL FACTS**

FACTS RELEVANT TO DEFENDANTS' "CAUSE VERSUS CONDITION" ARGUMENT

1.    When Mr. Batesel left the Trinity Brick yard on November 14, 2005, he did not know whether the subdivision where he was delivering his load of bricks was gated, does not know whose responsibility it was to inform him that the subdivision was gated and he has never been told by his employer, Trinity Brick whether a subdivision is gated or not. **EXHIBIT 7** at p. 17, l. 24 – p. 20, l. 22.

2.      Trinity Brick initially responded to discovery by positively asserting it had in place, at the time of the accident, specific procedures to determine whether a delivery site was obstructed:

**INTERROGATORY NO. 13.**  Describe the process by which You determine whether a delivery is scheduled to be sent to a location which is secured by a public or private, temporary or permanent gate or door which could be locked.

**RESPONSE TO INTERROGATORY NO. 13:** Objection. Defendant objects to htis Interrogatory as it is overly broad and unduly burdensome.  Defendant also objects as [sic]  this Interrogatory as it is not reasonably calculated to lead to the discovery of admissible evidence.  Without waiving said objection, upon taking an order, it is asked at the time of each individual order if there are any obstructions to delivery.  If obstructions are relayed, then arrangements are made for those obstructions to be removed prior to arrival.

**REQUEST FOR ADMISSION NO. 1.**  Admit that on the date of the Accident You did not have any process in place which You used in the normal course of business to ascertain whether a delivery made by any of Your employees was being sent to a location which was secured by a permanent or temporary, public or private, gate or door which could be locked.

**RESPONSE**: Denied.

**REQUEST FOR ADMISSION NO. 2.**  Admit that on the date of the Accident You did not have any process in place which You used in the normal course of business to confirm that any delivery made by any of Your employees to a location which was secured by a permanent or temporary, public or private, gate or door which could be locked would be unlocked and accessible at the time of delivery.

**RESPONSE**: Denied.

10

EXHIBIT 8, excerpts of Trinity Brick Responses to Interrogatories, served August 31, 2009, and Trinity Brick's Responses to Requests for Admission, served August 25, 2009.

3.     Though no representative of Trinity Brick signed any verification of its Interrogatory answers, the Trinity Brick corporate representative, Dennis Lippoldt, stated that he expected those answers were true and accurate.  *See* Excerpts of Transcript of Deposition of Dennis Lippoldt, attached as EXHIBIT 9 at p. 70, l. 24 – p. 71, l. 12.  Further, Trinity Brick's counsel stipulated on the record that Trinity Brick's Interrogatory answers were true and accurate.  *Id*. at p. 70, l. 24 – p. 71, l. 13.

4.     On January 22, 2010, Mr. Lippoldt confirmed Mr. Batesel's testimony and contradicted Trinity Brick's initial discovery responses.  Specifically, Mr. Lippoldt testified that Trinity Brick, at the time of the accident, did not have any "specific procedure in place for advising its drivers of obstructions or locked gates or other difficulties they may have in delivering their load," did not have "any process in place that Trinity Brick used in the normal course of its business to ascertain whether a delivery that was being made by any employee was being sent to a location which was secured by a permanent or temporary public or private gate or door which could be locked."  *Id*. at p. 20, l. 24 – p. 21, l. 13 and p. 51, l. 10 – p. 52, l. 11.

5.     Trinity Brick, on the date of the accident, "did not ask, upon receiving an order, whether the delivery site would be obstructed or locked."  *Id*. at p. 22, ll. 8 – 14.

6.     Despite the fact that Mr. Lippoldt stated it would take "20 seconds, maybe" to inquire about gates or obstructions at delivery sites, Trinity Brick still has no process in place

for inquiring or determining whether a delivery site is obstructed or gated.  Occasionally, if the person taking the order notes that the delivery site is what Trinity Brick employees consider a "rural" site, they will ask about gates or obstructions.  Generally, though, Trinity Brick relies on its customers to offer information of gates or obstructions and the manner in which any such gate or obstruction should be removed prior to delivery. **EXHIBIT 9** at p. 20, l. 24 – p. 22, l. 24, p. 61, ll. 14 – 21 and p. 68, ll. 6 – 10.

7.     Mr. Batesel gets paid by the delivery, a percentage of each load delivered, and he is "always in a hurry" because he gets "paid by what [he does]."  **EXHIBIT 7** at p. 86, l. 25 – p. 87, l. 11.

8.     Mr. Lippoldt stated that he did not disagree with Mr. Batesel's position that "he essentially makes more money the faster he turns these deliveries around ..." *Id*. at p. 51, ll. 5 – 9.

9.     Before Mr. Batesel began making his left turn from the northbound lane of North Coltrane Road ("Coltrane"), a public thoroughfare, onto the westbound lane of the private drive, Oakdale Forest Road ("Oakdale"), he could see that there was a gate that was shut and that the gate would require a key code.  **EXHIBIT 7** at p. 85, ll. 9 – 15.

10.    Mr. Batesel "was pretty sure" that when he pulled up to the gate his trailer would not fit in the entryway.  *Id*. at p. 22, l. 17 – p. 23, l. 18.

11.    Mr. Batesel acknowledged that he could have driven past Oakdale and stopped his truck at a safer place than "at the entrance of the subdivision where portions of it would

stick out on the travel portion [of Coltrane]," but doing so would not be "convenient" and would require him to go "out of his way."  **EXHIBIT 7** at p. 23, l. 15 – p. 24, l. 24.

12.     At the location of the accident, where Oakdale abuts Coltrane, the shoulder of the northbound lane of Coltrane ("the east shoulder") is paved and measures between four and five feet wide.  *See* photographs attached as **EXHIBIT 10**, all taken from the north side of the accident site and showing the east shoulder as it existed at the time of the accident. *See* also Expert Report of Robert Painter, attached as **EXHIBIT 11** at Page Three, second full paragraph ("The east shoulder is between four and five feet wide, depending on where it is measured ...") and Expert Report of Ron Blevins, attached as **EXHIBIT 12** at ¶ 3 ("[Coltrane] has a 5 foot wide paved east shoulder ...").

13.     On March 14, 2008, Mr. Batesel informed State Auto that there was no shoulder on Coltrane and further informed State Auto that there was no place for him to go except to pull up to the gate.  *See* **EXHIBIT 13**, Transcript of Recorded Statement of James Batesel, dated March 14, 2008, at pages identified as TRIN 723 – 724.

14.     When asked whether he could have parked somewhere other than on Oakdale, Mr. Batesel maintained that "there ain't nowhere to park."  He also testified that he could not pull off on the east side of northbound Coltrane because the shoulder only extended "[m]aybe a foot, foot and a half, then it dropped, I don't know, two, two and a half foot" and it was his opinion that he "could have turned over" had he pulled to the side of the road. *Id.* at p. 23, l. 15 – p. 24, l. 24 and p. 85, l. 16 – p. 86, l. 8.

15.     Mr. Batesel could have made "a mile section," by passing Oakdale to the next intersection, and making turns until he returned to Oakdale.  He described this as the "easiest way to turn that long of a truck around," but elected against it because of the time it would take.  **EXHIBIT 7** at p. 23, l. 19 – p. 24, l. 24 and p. 96, l. 21 – p. 98, l. 24.

16.     There was another entrance to the delivery site Mr. Batesel was traveling to which he did not learn about until after the accident.  That entrance was long enough that "the back part of [his] rig does not stick out in the travel portion of the roadway ..."  Mr. Batesel described this entrance as a "better" entrance.  *Id.* at p. 62, ll. 10 – 24 and p. 64, l. 9 – p. 65, l. 10.

17.     Mr. Batesel's plan was to make a phone call and get the code number after pulling up to the locked gate.  If he had been unable to get the phone number, he would have "back[ed] out and moved around somewhere else."  He testified that he could have backed the truck out safely without assistance, because he "get[s] in them positions all the time."  Mr. Batesel confirmed that he gets in these "positions" on roads "with a 45-mile-an-hour speed limit," "[n]ot every day, but it happens a lot."  *Id.* at p. 104, l. 1 – p. 105, l. 20.

18.     Since the accident, Mr. Batesel has had one incident where he had to wait an hour and a half for a gate to open.  The entryway was long, so he was not in the road on that date.  He has also had to unload his truck out of the road sometimes.  *Id.* at p. 135, ll. 9 – 18.

19.     Mr. Batesel stated that he believed his left turn onto Oakdale was not unsafe, despite the fact that his truck was partially blocking the southbound lane of Coltrane, <u>because</u> there was no traffic when he made his turn.  **EXHIBIT 7** at p. 104, ll. 1 – 11.

20.    Mr. Batesel did not consider the fact that another motorist might run into his truck because he "figured they could see it," and he "didn't plan on being there long." *Id*. at p. 36, l. 25 – p. 37, l. 16.

21.    Mr. Batesel "**expected** people to go around" the portion of his trailer that was partially blocking Coltrane. *Id*. at p. 131, ll. 10 – 17 (emphasis added).

22.    Mr. Batesel was aware, at the time he elected to get back into the cab of his truck, that Ms. Kinney was planning to turn around to use the remote in her car to open the gate for him. He "got in the truck and was waiting for her to turn around." *Id*. at p. 29, l. 23 – p. 30, l. 10, p. 44, l. 1 – 46, l. 22.

23.    Mr. Batesel "did not pay attention" to whether Ms. Kinney could see southbound traffic on Coltrane around his truck. **EXHIBIT 7** at p. 132, l. 18 – p. 133, l. 5.

24.    The photographs of the accident site show the Trinity Brick truck driven by Mr. Batesel <u>without</u> the load of bricks that was on the trailer at the time of the accident. *See* photographs attached as **EXHIBIT 13.** Mr. Batesel confirmed that, at the time of the accident, he had 26 or 27 packages of brick on the trailer, each package consisting of 500 bricks. **EXHIBIT 7** at p. 91, l. 9 – p. 95, l. 25.

25.    Mr. Batesel also testified that the diagram of the accident site drafted by the investigating officers was slightly off. Specifically, he agreed with Mr. Payne that the angle of the trailer was "a little bit off" and that he did not "think it was sitting right." He agreed that the trailer was "a little more straight" at the time of the accident than the diagram (and photographs) demonstrate. **EXHIBIT 7** at p. 136, l. 3 – p. 141, l. 25. *See also* **EXHIBIT 14**,

diagram utilized by Mr. Batesel as an exhibit to his deposition with lines drawn on by Mr. Batesel.

26.    Coltrane has a total width of approximately 24 feet.  **EXHIBIT 15** at p. 3, second full paragraph and **EXHIBIT 16** at ¶ 4.  The center of Coltrane is marked with double yellow lines, but there are no double yellow lines at the place where Oakdale abuts Coltrane.  *Id*.

27.    Mr. Batesel guessed his trailer was extending "five to eight feet" into the southbound lane of Coltrane.  *Id*. at p. 141, ll. 19 – 25.

28.    The experts in this matter have opined that Mr. Batesel's truck was extending anywhere from 4.5 to 6.25 feet into the southbound lane of Coltrane at the time of the accident.  **EXHIBIT 15** at p. 4, first full paragraph and **EXHIBIT 16** at ¶ 5.

29.    The investigating officers made note of the fact that Mr. Batesel's truck was "partially blocking the south bound lane of Coltrane Road."  **EXHIBIT 17**, factual notation excerpts of Official Oklahoma Traffic Collision Report.

30.    Mr. Payne testified that he saw Mr. Batesel's truck as he "came over the bridge" and he saw "no traffic, no other cars around that [he] could see."  He could see over the bricks on Mr. Batesel's truck to the rest of Coltrane.  He first saw Ms. Kinney's vehicle as he "started out around that [Mr. Batesel's] truck."  **EXHIBIT 1** at p. 20, l. 11 – p. 21, l. 2 and p. 45, l. 24 – p. 47, l. 16.

31.    When the wreck occurred, Mr. Batesel was sitting in his truck.  Mr. Batesel did not see Mr. Payne's truck at any time prior to looking in his rearview mirror and seeing a

"blur" right before he heard the collision. **EXHIBIT 7** at p. 31, l. 25 – p. 32, l. 23 and p. 47, ll. 3 – 5.

32.     Mr. Batesel believes he had been sitting at the entryway on Oakdale less than 5 minutes before the accident took place. *Id*. at p. 99, ll. 7 – 23.

33.     Mr. Painter, Plaintiff's expert, has opined that Mr. Batesel was negligently parked, the accident would not have occurred if Mr. Batesel had made sure the way was clear for Ms. Kinney and Mr. Batesel should have stopped his trailer on Coltrane and not obstructed the view of the traffic on Coltrane and Oakdale. **EXHIBIT 15** at p. 9 – 10, ¶¶ 4, 5 and 7.

34.     Mr. Batesel accepts no responsibility for the accident of November 14, 2005, an believes he was zero percent at fault. **EXHIBIT 7** at p. 96, ll. 10-19.

35.     Mr. Lippoldt, the person responsible for the safety training at Trinity Brick, maintains that Mr. Batesel was not "involved" in the November 14, 2005, accident; Mr. Batesel was not at fault because he did not receive a ticket; Mr. Batesel was zero percent at fault for the accident of November 14, 2005, and that Trinity Brick bears no responsibility for the accident of November 14, 2005. **EXHIBIT 9** at p. 10, l. 16 – p. 11, l. 4; p. 33, ll. 10-22; p. 66, ll. 9-19 and p. 68, ll. 11-22.

FACTS RELEVANT TO DEFENDANTS' CONTRIBUTION ARGUMENT

36.     Plaintiff disputes that any of Mr. Ferris' testimony is relevant to the issues presented in Defendants' Motion for Summary Judgment.  Mr. Ferris was presented for deposition in his capacity as a fact witness and employee of Progressive, not as a FED.R.CIV.P. 30(b)(6) corporate representative or designee. **EXHIBIT 5** at p. 1 – 10, p. 13,

l. 22 – p. 18, p. 16, ll. 11 – 16 and **EXHIBIT 18**, Notice of Deposition.  Mr. Ferris has no legal

training.  **EXHIBIT 5** at p. 10, l. 17 –  p. 13, l. 12.  The extent of Mr. Ferris' training on the

concepts of liability is two two-week educational courses provided by Progressive and his

ongoing, on-the-job training.  *Id.*  Further, counsel for Progressive objected to the lines of

questioning involving liability determinations, as they called for legal conclusions.  *Id.* at p.

40, l. 13 – p. 42, l. 15.  Finally, as set forth in ¶ 15, above, Oklahoma's Contribution Act

permits the pursuit of a co-tort-feasor that is jointly or severally liable, not only those tort-

feasors that are jointly and severally liable.  12 O.S. § 832.

37.     Mr. Ferris reviewed no documents in preparation for his deposition.  **EXHIBIT
5** at p. 15, l. 20 – p. 16, l. 10.

38.     In response to an inquiry as to whether Progressive was making a claim against

anyone while Mr. Ferris was the adjuster on the file, Mr. Ferris testified that he did not recall

if Progressive had initiated a subrogation action against anyone while he was handling the

claim.  *Id.* at p. 28, ll. 2 – 14.

39.     Mr. Ferris testified that, based on the investigation he had completed at the time

he authored his correspondence of January 17, 2006, he believed Mr. Payne was 80% at fault,

Ms. Kinney was 5% at fault and Mr. Batesel was 15% at fault.  He also testified that he

believed his review of the police report was "a large part of -- of [his] determination ..."  *Id.*

at p. 34, l. 2 – p. 35, l. 12.

40.     Mr. Ferris testified that the purpose of the January 17, 2006, correspondence

he authored was to let Trinity Brick know the result of his investigation, to "give them an

18

opportunity to put their liability carrier on notice," and indicate that there was some negligence attributed to their employee "possibly for purposes of future subrogation or contribution, [to] seek contribution from them at some point."   **EXHIBIT 5** at p. 39, l. 22-p. 40, l. 8.

### ARGUMENTS AND AUTHORITIES

#### APPLICABLE STANDARDS

Plaintiff agrees with Defendants' statement of the relevant law concerning the standard by which this Court is to measure Defendants' Motion for Summary Judgment.  In addition, and in light of Defendants' "cause versus condition" argument, Plaintiff concedes that "[n]egligence is not actionable unless it *proximately causes* the harm for which liability is sought to be imposed." *Jackson v. Jones*, 907 P.2d 1067, 1072 (Okla.1995) (emphasis in original, footnote omitted).  Defendants provide this Court with ample citation from various cases which set forth the reasoning of why, in those particular cases, the courts found the act complained of was not a proximate cause of the injury at issue.  Defendants do not, however, provide this Court with any guidance from Oklahoma case law concerning the standard by which proximate cause – the essential element of Defendants' cause versus condition argument – is to be measured.  Similarly, Defendants do not set forth the Oklahoma law which governs the issue of whether an intervening cause rises to the level of a supervening cause so as to break the causal chain.

The standard by which proximate cause is measured is  <u>foreseeability</u>. *See Blanke v. Alexander*, 152 F.3d 1224, 1235 (10th Cir.1998), citing *Tomlinson v. Love's Country Stores,*

*Inc.*, 854 P.2d 910, 915 – 16 (Okla.1993).  "[T]he question of *proximate cause* is generally one of fact for the jury.  It becomes one of law *only* when there is *no evidence* from which a jury could reasonably find a causal nexus between the act and the injury."  *Jackson* at 1072 – 73 (emphasis in original, footnotes omitted).

Defendants' Motion for Summary Judgment states that the focal point of courts when assessing whether, under Oklahoma law, "a vehicle is the proximate cause is not the motion or lack thereof of a vehicle, but the surrounding environment: whether daylight and distance provided surrounding moving vehicles with sufficient warning of the stopped vehicle's presence in their lane of travel."  *See* Defendants' Motion for Summary Judgment [Doc. No. 43] at page 15, first full paragraph. This may be Defendants' interpretation of the case law, but this is <u>not</u> the legal standard to be applied to the question of whether Mr. Batesel's negligence was a proximate cause of the accident at issue.

In order for Defendants to succeed in their argument that Mr. Batesel's decision to stop his truck in a manner that partially blocked southbound Coltrane was a mere condition and not a proximate cause of the accident at issue, they must demonstrate that the causal chain between that negligent act and the collision which resulted in Ms. Kinney's injuries was <u>broken</u> by a <u>supervening cause</u>.  *Jackson* at 1073.  Whether an event rises to the level of a supervening cause is governed under a specific three-prong test that incorporates the concept of foreseeability:

> For an occurrence to rise to the magnitude of a *supervening cause* it must possess three attributes: (1) *independence* from the original negligent act, (2) *adequacy of itself* to bring about the complained-injury and (3) *reasonable unforseeability*.  The

> question of an intervening event's *foreseeability* calls for an
> *evaluative determination* by the trier of fact. Whether the
> injurious consequences that resulted from the original
> negligence could have been reasonably foreseen is an issue
> traditionally within the realm of *fact*, *not law*.  If the intervening
> force is of a character which (under the circumstances) would
> induce belief that it might be *reasonably expected* to occur, the
> final element is *not* met and the causal chain will remain
> *unbroken*.

*Jackson* at 1073 (emphasis in original, footnotes omitted).

   *Jackson* appears to be the most recent Oklahoma Supreme Court case which discusses

the concepts of proximate cause, foreseeability and the intervention of a supervening cause

which breaks the causal chain in the specific context of an automobile accident.   In

subsequent negligence cases involving claims of medical malpractice, the Oklahoma

Supreme Court has relied on *Jackson* extensively in support of the analysis of proximate

cause, foreseeability and the intervention of a supervening cause.  *See Jones v. Mercy Health

Center, Inc.*, 155 P.3d 9 (Okla.2006) and *Johnson v. Hillcrest Health Center, Inc.*, 70 P.3d

811 (Okla.2003).  These two cases make it absolutely clear that as a general matter, questions

of proximate causation should be submitted to a trier of fact:

> The existence of proximate cause is generally a question of fact
> for the jury to determine and becomes a question of law only if
> there is **no evidence** from which a reasonable person could find
> a causal nexus between the defendant's negligent act and the
> plaintiff's injury. [Citation omitted.]   However, **if the facts
> relevant to causation are disputed or if conflicting inferences
> can be drawn from the undisputed facts, the determination
> of causation <u>must</u> be left for the trier of fact.** [Citation
> omitted.]  **Causation need not be established to a degree of
> absolute certainty**. [Citation omitted.]

*Jones* at 14 (emphasis added, citations omitted).  *See also Johnson* at 819, FN 25.

Under the appropriate standard, therefore, the analysis of whether Mr. Batesel merely presented a condition which facilitated the accident at issue, rather than acting as a proximate cause of that accident, will be heavily fact-intensive.  <u>Only</u> if there are <u>no</u> disputed facts or if <u>no</u> conflicting inferences can be drawn from the undisputed facts regarding proximate cause – and, specifically, the three prongs of the supervening cause test articulated in *Jackson* – may summary judgment be granted in favor of Defendants.  There are, as set forth herein, disputed facts and reasonable minds could easily draw conflicting inferences from the undisputed facts on the issue of proximate cause.  As such, Plaintiff respectfully submits that summary judgment cannot be granted in this matter.

### PROPOSITION I: THE ISSUE OF WHETHER MR. BATESEL WAS A PROXIMATE CAUSE OF THE ACCIDENT <u>MUST</u> BE LEFT FOR A TRIER OF FACT.

Each of the cases relied upon by Defendants is distinguishable on one important but simple fact – in each case, the accident at issue occurred when a collision occurred between vehicles which <u>were visible to one another</u> *despite* the presence of a negligently parked vehicle.  *See Vogt v. Gen. Tel. Co. of Southwest*, 413 F.Supp. 4 (E.D.Okl.1975),  *Beesley v. United States*, 364 F.2d 194 (10th Cir.1966); *Thur v. Dunkley*, 474 P.2d 403 (Okla.1970), and *Mote v. Hilyard*, 358 P.2d 844 (Okla.1961) (Each accident involved vehicles which were struck or forced off the road after other vehicles came to a stop due to an allegedly negligently parked or stopped vehicle).  *See also Woodward v. Kinchen*, 446 P.2d 375 (Okla.1968) (Passenger plaintiff alleged host driver stopped car in lane of travel negligently before being backed into by another vehicle) and *Evans v. Caldwell*, 429 P.2d 962

(Okla.1967) (Defendant struck negligently parked vehicle on a bridge and then struck plaintiff). The case of *Phillips Petroleum Co. v. Robertson*, 247 P.2d 277 (Okla.1952) has nothing to do with a parked or stopped vehicle and is completely inapposite to this matter.

One of the cases relied upon by Defendants <u>highlights</u> the difference between those cases where the courts found that the negligently parked vehicle was not a proximate cause and the facts of the accident of November 14, 2005. *See Sturdevant v. Kent*, 322 P.2d 408 (Okla.1958). The plaintiff sought recovery after striking an allegedly negligently parked vehicle which extended into a lane of travel approximately six feet. The court, in finding there was no proximate cause, specifically noted, "The remaining twelve feet were unobstructed and **no other vehicle was in the vicinity**." *Sturdevant* at 410. This is a key factual distinction.

If Plaintiff's insured had struck a vehicle that he could observe and see despite the presence of Mr. Batesel's negligently parked truck, this case would not have been filed. Clearly, it is not reasonably foreseeable that other drivers will suddenly lose the ability to see and maneuver around a visible parked car or other visible cars that must stop because of a parked car. The line of Oklahoma cases dealing with the proximate causation issue in the context of a negligently parked or stopped vehicle demonstrates that when it is reasonably foreseeable that the negligently parked or stopped vehicle will interfere with another driver's vision or ability to maneuver, the question of whether that vehicle is a proximate cause of an accident and resulting injury is one of fact for the jury. *See Ross v. Gearin*, 291 P.534 (Okla.1930); *Cleveland v. Stanley*, 9 P.2d 10 (Okla.1932); *Shefts Supply Co. V. Purkapile*,

36 P.2d 275 (Okla.1934), and *Dirickson v. Mings*, 910 P.2d 1015 (Okla.1996) (Each case involving a negligently parked or stopped vehicle which was unlighted at night or during a dark day, and there was an issue of fact as to whether the vehicle could be seen).

There are three cases, two of which are uncited by Defendants, which involve factual scenarios similar to the one presented by this case.  Each case found the issue of proximate cause was properly submitted to a jury.  *See England v. Kilcrease*, 456 P.2d 521 (Okla.1969); *Bannister v. Noble*, 812 F.2d 1265 (10th Cir.1987), and *Jackson*.  In *England*, the plaintiff had been following another vehicle for approximately three miles at a distance of 150 to 200 feet and a speed of between 55 and 60 mph.  *England* at 522.  The defendant's vehicle had stalled in the right lane of two northbound lanes – the lane in which plaintiff and the truck she was following were traveling – at the crest of a hill.  *England* at 522.  The truck in front of plaintiff swerved sharply from the right northbound lane to the left northbound lane to avoid the stalled car, and plaintiff collided with the stalled car.  *Id.*  The defendant asserted her stalled car presented a condition, not a proximate cause, because plaintiff could have seen the stalled car from as far as 1500 feet away.  *Id.*  The trial court permitted the case to go to a jury, which entered a verdict in favor of the plaintiff.  *Id.*  Upholding the verdict, the Oklahoma Supreme Court stated, "In the instant case there was conflicting evidence in the record as to whether plaintiff **could have seen** the stalled vehicle in time to avoid a collision due to the terrain and the pickup truck in front of her blocking her vision."  *Id.* at 523 (emphasis added).

24

More recently, the Tenth Circuit addressed a fact pattern where the plaintiff crested a hill and saw a dump truck parked in his lane of the road. *Bannister* at 1267.  Road crew workers were filling potholes.  *Id.*  As Bannister steered across the center line into the oncoming lane to avoid the stopped dump truck, a road crew worker also stepped over the line into Bannister's path.  *Id.*  Bannister swerved off the road to avoid the worker and was severely injured.  Id.  Noble argued that its parked dump truck, stopped on the Noble, Oklahoma, side of the road, created a mere condition and the intervening negligent act of the road crew worker, stepping into Bannister's path, was a supervening cause which broke the chain of proximate causation.  *Id.*  The Tenth Circuit upheld the District Court's submission of the issue of proximate cause to the jury, specifically stating:

> '[n]ot every intervening cause will insulate the original negligent actor from liability.' [Citation omitted.] '**If a causal factor is capable of combining or acting in concert with another act or omission to produce the injury, each negligent actor will be subject to liability for the harm that evolves**.' [Citation omitted.]

*Bannister* at 1267 (emphasis added, citations omitted).

*Jackson*, the Oklahoma Supreme Court's most recent pronouncement on the "cause versus condition" argument in the context of an automobile accident, is instructive.  In that chain-reaction scenario, the accident at issue took place on I-40 at a place where it was expanding into multiple lanes headed in the same direction.  *Jackson* at 1070.  One driver, upon seeing a police officer activate his lights and turn into the median, pulled onto the median with the rear of her vehicle extending into the left-most "fast" lane of two lanes for same-direction travel.  *Id.*  A second vehicle managed to stop behind the first, but a third

vehicle maneuvered around these two by switching into the right-most lane.  *Id.*  A fourth vehicle, also traveling in the left-most lane, then collided with the rear of the second, stopped vehicle.  Finally, a fifth vehicle then struck the fourth.  *Id.*  The driver and passenger of the fourth vehicle sued the city for the acts of the officer, and the drivers of the first, second and fifth vehicles.  The trial court found, among other things, that the second stopped vehicle was a supervening cause which insulated the officer and the first stopped vehicle from liability.  *Id.*  Jackson and Cox, the driver and passenger of the fourth vehicle, appealed the trial court's ruling.  In response, the dismissed defendants argued that Jackson's actions, like those of the second stopping car, rose to the level of a supervening cause which insulated them from a jury determination of proximate cause.  *Jackson* at 1074.

Upon review, the Court found that differing inferences could be drawn from the undisputed facts.  For instance, it was undisputed that the third vehicle had maneuvered into the right lane and avoided a collision.  The Court stated that two opposite inferences could be drawn from that fact – either Jackson could have also avoided the second car, or the traffic in the right lane was too heavy for him to make a similar maneuver.  *Id.*  As the Court noted:

> From the vantage point of Jones [the first vehicle], reasonable anticipation of Jackson's collision with the Perry mobile home [the second vehicle] (which may or may not have been able to circumnavigate the Jones vehicle) is a question upon which reasonable minds might differ.  Hence, the foreseeability of Jackson's acts – negligent or not – must be left for an evaluative decision of the jury.

*Id.*

_____In this case, Mr. Batesel candidly testified that he often gets into positions where his truck obstructs roads such as Coltrane, with 45 mph speed limits. **PLAINTIFF'S COUNTER-STATEMENT ("PCS") 17**. He also forthrightly stated that he was always in a hurry because he gets paid based on how many loads he delivers. **PCS 7**. He knew, before he turned left onto Oakdale, that there was a closed gate and that the gate would require a key code. **PCS 9**. Mr. Batesel had, however, left the Trinity Brick yard with no knowledge of whether his delivery site was gated or obstructed. **PCS 1**. Mr. Batesel was "pretty sure" when he turned left onto Oakdale that his truck would block traffic, but that he "figured [people] could see it," he "didn't plan on being there long," and he "expected people to go around" his trailer. **PCS 10, 20, 21**. He "did not pay any attention" to whether Ms. Kinney could see around his truck, but he <u>knew</u> she intended to turn her car around to face the gate so she could unlock it for him. **PCS 22**. Mr. Batesel did not even look for any traffic coming southbound while Ms. Kinney was making this maneuver, as evidenced by the fact that he did not see Mr. Payne's truck until the collision occurred. **PCS 31**. Mr. Payne could see Mr. Batesel's truck as he came over the bridge. **PCS 30**. He could see no other traffic on the road and did not see Ms. Kinney's car until it came around Mr. Batesel's truck. *Id.*

There is no question that the east shoulder of Coltrane was paved for a width of approximately five feet. **PCS 12**. There is a question of whether Mr. Batesel recognized this fact. **PCS 13, 14.** There is also a dispute about whether Mr. Batesel should have pulled off the road parallel to northbound Coltrane, rather than pulling onto Oakdale. **PCS 13, 14, 33**.

It is undisputed that Mr. Batesel could have passed the locked Oakdale entry and made a "mile section" while he attempted to get the gate code.  **PCS 15**.

Mr. Batesel testified that he has had to sit and wait for a gate to open for over an hour. **PCS 18**.  Are Defendants suggesting that any traffic that encountered Mr. Batesel's lane-blocking trailer should have waited for that length of time, had it taken that long to get this particular code?  It is extremely reasonable that Mr. Payne would go around Mr. Batesel's truck, rather than stop and create an additional obstruction in the roadway, even closer to the bridge and hillcrest on the north side of the accident site.  Though Defendants attempt to characterize Mr. Payne's decision to go around Mr. Batesel's truck as a "supervening cause," **this is exactly what Mr. Batesel expected people to do.  PCS 21**.  If Mr. Batesel expected people to take this action, clearly it was foreseeable.

Mr. Batesel was the reason Ms. Kinney decided to turn her car around.  **PCS 22**.  Mr. Batesel was the reason Mr. Payne moved into the southbound lane of Coltrane. **PCS 30**. Though Mr. Batesel's negligent parking and obstruction of the roadway may not have been adequate, of itself, to cause an injury, even Mr. Batesel recognizes that only the absence of traffic kept his decision from being dangerous.  **PCS 19**.   Clearly, under the facts and the reasonable inferences which can be drawn from the facts, Defendants cannot demonstrate that Ms. Kinney's actions or Mr. Payne's actions rise to the level of a supervening cause. Neither of them acted independently of Mr. Batesel's negligent action and Mr. Batesel himself has testified that he "expected" people to go around him.  Under the facts of this

case, neither the first nor the third prong of the supervening cause test articulated in *Jackson* can be met.  As such, the question of proximate cause is one of fact for the jury.

**PROPOSITION II: THE ISSUE OF WHETHER TRINITY BRICK WAS A DIRECT PROXIMATE CAUSE OF THE ACCIDENT <u>MUST</u> BE LEFT FOR A TRIER OF FACT.**

Trinity Brick has contradicted *itself* concerning the issue of whether it has any process in place to determine whether a delivery site is locked or gated, or any process to ensure that obstructions are removed from a delivery site prior to the actual delivery.  **PCS 2 – 5**.  Trinity Brick is aware that Mr. Batesel gets into situations where he is blocking roads with speed limits of 45 mph, and that Mr. Batesel is motivated to hurry in order to get paid.  **PCS 7, 8, 14.**  Despite this, and though it would take 20 seconds to find out whether obstructions exist and determine a method of removing an obstruction, Trinity Brick makes no such effort.  **PCS 6**.  As far as Trinity Brick is concerned, unless its driver gets a ticket, that driver has no responsibility – and is not even considered to be "involved" in – an accident.  **PCS 35**.

The undisputed facts give rise to the reasonable inference that Trinity Brick's failure to implement a 20-second process was a proximate cause of this accident.  Defendants made no argument as to the direct negligence of Trinity Brick, or as to why any of the actions of Mr. Payne or Ms. Kinney should be considered a supervening cause which would break the causal chain which was initiated by Trinity Brick.  As such, Plaintiff respectfully submits that summary judgment in favor of Trinity Brick is unwarranted.

**PROPOSITION III: OKLAHOMA LAW EXPRESSLY PERMITS A CONTRIBUTION ACTION AGAINST A TORTFEASOR WHICH IS JOINTLY <u>OR</u> SEVERALLY LIABLE.**

29

_____As Plaintiff fully briefed in its Response to Defendant's Motion to Compel [**DOC.NO.**

**38**], which Plaintiff incorporates by reference herein, Defendants' analysis of Oklahoma

statutory and case law governing joint and several liability and contribution is, simply,

incorrect.  *See* [**DOC.NO.38**] at Proposition I, pages 20 – 23.  Defendants are correct a

tortfeasor is deemed to have "several" (individual) liability for only its share of fault unless

that tortfeasor is found to be greater than 50% at fault for an accident, at which time the

tortfeasor becomes "jointly and severally" liable.  23 O.S. § 15.  The Contribution Act

permits a settling tortfeasor – regardless of the percentages of fault which may be distributed

among the tortfeasors and plaintiff – to seek contribution from the other tortfeasors.  12 O.S.

§ 832.  *See also National Union Fire Insurance Company, et al. v. A.A.R. Western Skyways

Inc., et al.*, 784 P.2d 52, 1989 OK 157, *National Union Fire Insurance Company, et al. v.

A.A.R. Western Skyways Inc., et al.*, 992 F.2d 282 (W.D.Okla.1993) and *Robinson, et al. v.

Missouri Pacific Railroad Company*, 16 F.3d 1083 (W.D. Okla.1994).

Defendants' suggestion that Plaintiff's assertion of the attorney-client and work

product privileges is, somehow, a concealment or false representation which would rise to

the level of equitable estoppel is absurd.  Further, it presumes that a party can be "equitably

estopped" from seeking contribution simply because a plaintiff is not fault-free or one of the

tortfeasors may not be more than 50% at fault.  As noted above, this presumption is incorrect

pursuant to both Oklahoma statutory and case law.

WHEREFORE, for all of the reasons set forth herein and in [Doc.No.38] as

incorporated by reference, Plaintiff, Progressive Northern Insurance Company, respectfully

submits that summary judgment in favor of Defendants is unwarranted.

Respectfully submitted,


s/Dawn M. Goeres
Brad L. Roberson, OBA No. 18819
Dawn M. Goeres, OBA No. 21923
PIGNATO, COOPER, KOLKER & ROBERSON, P.C.
1120 Robinson Renaissance
119 North Robinson Avenue
Oklahoma City, Oklahoma 73102
Telephone:   (405) 606-3333
Facsimile:   (405) 606-3334
E-Mail:     brad@pclaw.org
E-Mail:     dawn@pclaw.org
**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on March 9, 2010, I electronically transmitted the foregoing to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit of a Notice of Electronic Filing to the following ECF registrants:

Maurice G. Woods, II


s/Dawn M. Goeres
For the Firm